**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH D. WELCH, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:13-CV-13 NAB |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying Elizabeth D. Welch's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and application for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  Because the Commissioner's final decision is supported by substantial evidence on the record as a whole, it is affirmed.

### I.  Procedural History

On January 8 and January 11, 2010, plaintiff filed her applications for disability insurance benefits (DIB) and supplemental security income (SSI),

respectively, alleging that she became disabled on March 1, 2009, because of a heart condition, back problems, and depression.  (Tr. 186-92, 193-97, 216.)  On May 19, 2010, the Social Security Administration denied plaintiff's claims for benefits.  (Tr. 115-16, 117-18, 120-25.)  Upon plaintiff's request, a hearing was held before an administrative law judge (ALJ) on August 17, 2011, at which plaintiff and a vocational expert testified.  Plaintiff's partner also testified at the hearing.  (Tr. 71-114.)  On September 1, 2011, the ALJ issued a decision denying plaintiff's claims for benefits, finding vocational expert testimony to support a conclusion that plaintiff was able to perform light work as it exists in significant numbers in the national economy, and specifically, retail marker, folding machine operator, and cafeteria attendant; as well as sedentary work, such as document preparer, circuit board assembler, and laminator.  (Tr. 54-66.)  On February 5, 2013, upon review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-6.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff contends that the ALJ's decision is not supported by substantial evidence on the record as a whole. Plaintiff specifically challenges the ALJ's determination regarding her residual functional capacity (RFC), arguing that the ALJ rendered only conclusory findings unsupported by the record; that no medical assessment appears in the record upon

which the ALJ could base an RFC determination; and that substantial evidence fails to show that plaintiff can perform sustained work-related activities. Plaintiff also claims that the ALJ erred in finding her subjective complaints not to be credible. Plaintiff requests that the final decision be reversed and that the matter be remanded for further development. For the reasons that follow, the ALJ did not err in his determination.[1]

## II. Testimonial Evidence Before the ALJ

A.    Plaintiff's Testimony

At the hearing on August 17, 2011, plaintiff testified in response to questions posed by the ALJ. Plaintiff was not represented by counsel at the hearing.

At the time of the hearing, plaintiff was forty-six years of age. Plaintiff stands five-feet, five inches tall and weighs 170 pounds. Plaintiff is single and lives in a mobile home with her longtime partner of thirty years and their two children, ages eleven and twelve. Plaintiff has a ninth-grade education and never obtained her GED. Plaintiff can read and write but has difficulty understanding the meaning of some words. Plaintiff receives food stamps and has no other source of

---

[1] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence. The recitation of specific evidence in this Memorandum and Order, however, is limited to only that relating to the issues raised by plaintiff on this appeal.

income.  Plaintiff has intermittently received Medicaid assistance.  (Tr. 81-84, 91.)

Plaintiff's Work History Report shows that plaintiff worked as a certified nurse's aide in a nursing home from 2004 to 2005, as well as for a few months in 2006.  Also in 2006, plaintiff worked for a few weeks as a caretaker through an independent living service.  In 2007, plaintiff worked for a few months as a prep cook in a restaurant.  From June 2008 to May 2009, plaintiff worked as a cook in a restaurant/convenience store.  (Tr. 257.)  Plaintiff testified that she was sent home from her last job on numerous occasions because of her high blood pressure and that her employer would not take her back when she returned to her job on March 1, 2009.  Plaintiff testified that she applied for other jobs before filing for disability, but no one would hire her.  (Tr. 84-86.)

Plaintiff testified that she has had two heart attacks, including one that occurred in 1999.  Plaintiff testified that she has had two stents placed, with her most recent stent procedure occurring in 2007.  (Tr. 100-01.)  Plaintiff testified that her high blood pressure appears to be controlled with medication.  Plaintiff testified that she also takes a blood thinner, aspirin, and other medication for her heart, as well as medication for cholesterol.  (Tr. 94-95, 97.)

Plaintiff testified that she has back pain because of slipped herniated discs and that the pain is usually at a level six or seven on a scale of one to ten.  Plaintiff testified that she takes OxyContin, Hydrocodone with Tylenol, and Flexeril for the

pain and that the medication brings her pain down to a level two or three.  Plaintiff testified that she sometimes experiences itching as a side effect of her medication. Plaintiff testified that she has never had surgery for her back condition but received an epidural spinal injection.  (Tr. 96, 98-99.)

Plaintiff testified that she suffers from depression and has crying spells once or twice a week.  Plaintiff testified that she also has anxiety and often feels as though she will have an attack.  Plaintiff testified that she takes medication that helps calm her.  Plaintiff testified that she hears things, but questioned whether it is her imagination.  Plaintiff testified that she has poor concentration.  Plaintiff testified that she has never seen a psychiatrist or psychologist for her conditions. (Tr. 96-97, 101-03.)

As to exertional abilities, plaintiff testified that she can sit for an hour and a half after which she must get up and stand or walk.  Plaintiff testified that she can stand for a "good while" but cannot walk very far because she gets hot, agitated, and out of breath.  Plaintiff testified that she walks a couple of laps on a nearby track.  Plaintiff testified that she can lift twenty to twenty-five pounds but cannot pick up anything heavy because of a prior wrist injury.  Plaintiff testified that she fears that too much lifting would affect her stents.  Plaintiff testified that she has problems bending and with climbing many steps because of her back pain. Plaintiff testified that she can care for her personal needs.  (Tr. 93, 100, 103-04.)

As to her daily activities, plaintiff testified that she gets up at 6:30 a.m. and "pick[s] up." Plaintiff testified that she sits around during the day and tries to walk for exercise. Plaintiff testified that she watches television and reads magazines. Plaintiff testified that she sometimes cooks, does the laundry, goes shopping, and makes the bed with help. Plaintiff testified that she experiences pain while standing at the sink doing dishes. Plaintiff testified that her partner does most of the sweeping, mopping, and vacuuming and will also help her with chores. Plaintiff testified that she has friends, is sociable, and gets along with other people. Plaintiff testified that she has a driver's license and drives approximately fifty miles a week. Plaintiff testified that she and her partner sometimes go out to eat on the weekends. Plaintiff testified that she enjoys fishing and swimming with her children and is active in church. (Tr. 82, 89-92.)

B.      Testimony of Plaintiff's Partner

Danny Shealor, plaintiff's longtime partner of thirty years, testified at the hearing in response to questions posed by plaintiff and the ALJ.

Mr. Shealor testified that he does most of the housework, including doing the dishes and the laundry; and also cares for the children, including feeding them and getting them ready for school. (Tr. 106-07.)

Mr. Shealor testified that he and plaintiff take walks but that plaintiff becomes worn out and short of breath after a couple of blocks. (Tr. 106.)

Mr. Shealor testified that plaintiff cries easily and is stressed.  (Tr. 107.)

Mr. Shealor testified that plaintiff reads the mail and the newspaper but does not read magazines at home.  (Tr. 107-08.)

C.     Testimony of Vocational Expert

Barbara Myers, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Ms. Myers classified plaintiff's past work as a nurse's aide as medium and semi-skilled and as a prep cook as medium and unskilled.  Ms. Myers further testified that plaintiff actually performed the work of prep cook at the light level of exertion.  (Tr. 110.)

The ALJ asked Ms. Myers to consider an individual forty-six years of age with a limited education and with plaintiff's past relevant work experience.  The ALJ asked Ms. Myers to further assume the individual to be

> capable of performing the exertional demands of light work as defined in the Social Security regulations; specifically, the person can lift, carry, push, pull 20 pounds occasionally, 10 pounds frequently; sit, stand, walk, each, six out [of] eight, for a total of eight out of eight; but, would limit the person - - occasional climb, occasional balance, occasional stoop, occasional crouch, occasional ladders, ropes, and scaffolds; no concentrated exposure to moving machinery, unprotected heights, vibrations, dusts, fumes, and gases.

(Tr. 111.)  Ms. Myers testified that such a person would be able to perform plaintiff's past relevant work as a prep cook as actually performed by plaintiff.

Ms. Myers further testified that such a person would also be able to perform light work as a retail marker, of which 27,000 such jobs existed in the State of Missouri and 1,500,000 nationally; as a folding machine operator, of which 800 such jobs existed in the State of Missouri and 31,000 nationally; and as a cafeteria attendant, of which 4,900 such jobs existed in the State of Missouri and 275,000 nationally. (Tr. 111-12.)

The ALJ then asked Ms. Myers to assume the same individual to be limited to sedentary work in that she could sit for six out of eight hours and stand/walk for two out of eight hours, for a total of eight out of eight hours; but to retain the same lifting, postural, and environmental limitations as in the first hypothetical. Ms. Myers testified that such a person could perform work as a document preparer, of which 800 such jobs existed in the State of Missouri and 30,000 nationally; as a circuit board assembler, of which 1,100 such jobs existed in the State of Missouri and 55,000 nationally; and as a laminator, of which 200 such jobs existed in the State of Missouri and 1,000 nationally. (Tr. 112-13.)

### III. Relevant Medical Records Before the ALJ

Plaintiff was admitted to St. Luke's Hospital on May 9, 1999, with complaints of chest pain and tingling and numbness in the arm. Dr. Alexander M. Bollis determined plaintiff's presentment to be compatible with acute myocardial infarction. Cardiac catheterization showed significant disease involving the

proximal region of the left anterior descending coronary artery, and primary stenting was performed.  Plaintiff was discharged on May 12, 1999.  (Tr. 564-67, 570.)  Subsequent myocardial scans in August 2000, April 2002, and August 2003 yielded normal results.  (Tr. 550-54, 555-62, 577-79.)

An x-ray of the thoracic spine taken April 28, 2006, in response to plaintiff's complaint of back pain was essentially normal with mild kyphosis noted.  (Tr. 617.)  An MRI of the lumbar spine taken May 13, showed disc bulging between L4-S1 with midline herniations of disc material at both the L4-5 levels.  The lateral recesses did not appear to be affected by such herniations.  An MRI of the thoracic spine taken that same date showed low signal irregularities in the posterior aspect of the thecal sac with possible very slight narrowing of the cord.  (Tr. 325-26.)

On May 26, 2006, plaintiff visited Dr. Kyo S. Cho with complaints of low back pain and sciatica.  Dr. Cho noted the results of the recent MRIs and referred plaintiff for epidural steroid injection at the L4-5 and L5-S1 levels of the spine.  (Tr. 335.)  Plaintiff underwent such injection on June 12, 2006.  (Tr. 321-24.)

On June 13, 2006, plaintiff visited Dr. Bollis at Pike County Memorial Hospital (PCMH) for follow up examination relating to coronary artery disease (CAD), status post myocardial infarction, status post percutaneous transluminal coronary angioplasty (PTCA), hyperlipidemia, and hypertension.  Plaintiff's

medications were noted to be Lopressor, Lovastatin, Xanax, and aspirin.[2]  Plaintiff

was noted to be doing well with no symptoms noted.  Physical examination was

unremarkable.  Dr. Bollis noted plaintiff's energy level to be reasonable.  No

changes in care were recommended.  (Tr. 303.)  On July 17, Dr. Bollis noted

plaintiff's conditions to be stable.  No changes in treatment were recommended.

(Tr. 313.)

Plaintiff was admitted to the emergency room at PCMH on June 27, 2007,

with complaints of chest pain and numbness/tingling in the arms and hands.  A

chest x-ray showed no active pulmonary disease.  An EKG showed marked sinus

bradycardia.  Plaintiff was transferred to St. Luke's Hospital that same date.  (Tr.

444-55, 465, 468, 475, 484.)

Upon plaintiff's admission to St. Luke's, plaintiff's history of myocardial

infarction in 1999 was noted with associated stent placement.  Plaintiff's history of

hypertension, anxiety, depression, and chronic pain was also noted.  It was noted

that plaintiff was taking multiple pain medications for lumbar disk herniation.

Cardiac catheterization showed new disease in the left coronary artery, and an

angioplasty was performed.  (Tr. 542-43, 576.)

Plaintiff visited Dr. Bollis on July 2, 2007, who noted plaintiff's recent stent

---

[2]  The administrative record does not contain any record of when these medications were
prescribed, by whom, or for what condition(s).

placement procedure.  Plaintiff reported no current chest pain or shortness of breath.  Dr. Bollis noted plaintiff's current medications to be Vicodin, Xanax, Norvasc, Lexapro, Plavix, Methocarbamol, Naprosyn, OxyContin, Zocor, Tizanidine, and Metoprolol.[3]  Physical examination was unremarkable.  Dr. Bollis instructed plaintiff to discontinue Naprosyn and aspirin and to return in a few weeks for follow up.  (Tr. 459.)  On July 30, plaintiff reported to Dr. Bollis that she experienced occasional bilateral hand numbness.  Positive Tinel's sign was noted.  Plaintiff reported having no chest pain or shortness of breath.  Dr. Bollis noted plaintiff's energy level to be good.  Dr. Bollis instructed plaintiff to contact him if her symptoms of numbness worsened.  (Tr. 612.)

An x-ray taken of plaintiff's lumbo-sacral spine on February 20, 2008, in response to plaintiff's complaints of back pain showed mild multilevel degenerative disk disease.  (Tr. 347.)  A follow up MRI taken of the lumbar spine on March 10 showed moderate disk bulging at the L4-5 level with a small annular tear in the disk posteriorly and centrally, with evidence of a small central disk protrusion and minimal central canal stenosis.  Moderate disk bulging at the L5-S1 level was also noted, with evidence of a small right paracentral annular tear of the disk and right paracentral disk protrusion.  (Tr. 341-44.)

---

[3]  The administrative record does not contain any record of when these medications were prescribed, by whom, or for what condition(s).

Plaintiff returned to Dr. Bollis on April 14, 2008, for follow up relating to CAD, status post myocardial infarction, status post PTCA, hyperlipidemia, and hypertension. Dr. Bollis noted plaintiff's current medications to be Vicodin, Xanax, Norvasc, Plavix, Methocarbamol, OxyContin, Tizanidine, Metoprolol, and Wellbutrin. Plaintiff reported having no problems with angina, shortness of breath, orthopnea, paroxysmal nocturnal dyspnea, or peripheral edema. Dr. Bollis noted plaintiff's energy level to be adequate. Plaintiff reported having no medication side effects. Plaintiff reported to Dr. Bollis that she had some bilateral arm numbness with occasional weakness. Physical examination was unremarkable. Dr. Bollis ordered laboratory and diagnostic testing. (Tr. 443.)

Plaintiff was admitted to the emergency room at PCMH on August 19, 2008, with complaints of chest pain radiating to her arm, back, and neck with associated nausea and shortness of breath. Plaintiff was noted to be anxious. A chest x-ray showed no evidence of acute cardiopulmonary disease. An ECG was normal. Plaintiff was discharged that same date. (Tr. 655-68.)

Plaintiff visited Pike Medical Clinic on January 7, 2009, for follow up regarding pain management. Plaintiff's medications were noted to include Metoprolol, Wellbutrin, OxyContin, Alprazolam, Hydrocodone, Plavix, and Cyclobenzaprine. Examination was essentially normal except musculoskeletal examination yielded abnormal findings. Skelaxin was prescribed. (Tr. 699.)

On February 10, 2009, plaintiff fell and injured her left wrist. X-rays showed a tiny avulsion fragment along the dorsum of the wrist. A splint was applied at PCMH, and plaintiff was discharged that same date. (Tr. 643-51.) Follow up x-rays taken March 18 showed no definite abnormalities. (Tr. 640-41.)

Plaintiff returned to Pike Medical Clinic on March 10, 2009, for pain management follow up. Musculoskeletal examination showed plaintiff's range of motion to be okay with decreased pain. Plaintiff's prescription for OxyContin was refilled. (Tr. 696.) On April 6, plaintiff reported to the Clinic that she was doing well on her current medications and had no problems. Examination showed limited range of motion about the lumbar spine. Plaintiff's medications were refilled. (Tr. 694.)

Between March 31 and April 23, 2009, plaintiff participated in physical therapy for her wrist. Upon conclusion of therapy, it was noted that plaintiff could carry twenty-five pounds without pain. Plaintiff reported that she could do all activities of daily living with little pain and that she had only slight discomfort associated with a bump on the back of her hand. Plaintiff was released to full work duty. (Tr. 672-79.)

X-rays taken of the left wrist and forearm on May 6, 2009, showed avulsion fracture off the dorsal aspect of the wrist, but were otherwise normal. (Tr. 637-38.)

Plaintiff returned to Pike Medical Clinic on May 6, 2009, for follow up

regarding her hypertension and depression and to obtain medication refills. (Tr. 693.) On June 9, it was determined that plaintiff would undergo cardiac consultation for angina. (Tr. 692.)

X-rays taken of the lumbo-sacral spine on July 13, 2009, yielded essentially normal results. (Tr. 635.)

Between August 7 and September 21, 2009, plaintiff visited Pike Medical Clinic on three occasions for follow up of her conditions, including depression and chronic pain. Plaintiff's pain medications were refilled during this period. (Tr. 688-90.)

On October 8, 2009, plaintiff returned to Pike Medical Clinic for treatment of her low back pain. Limited range of motion was noted. Plaintiff's prescriptions for Hydrocodone and OxyContin were refilled. It was noted that an MRI would be scheduled in order to recertify plaintiff's need for pain medications. Xanax was also prescribed. (Tr. 687.)

An MRI taken of the lumbar spine on October 24, 2009, showed small annular tears with bulging of the disc at both L4-5 and L5-S1. The disc bulges were noted to be less prominent than on the study from March 2008, and no adverse changes were seen. (Tr. 633.)

On November 4, 2009, Pike Medical Clinic prescribed Soma for neck spasms. Plaintiff's prescriptions for Hydrocodone and OxyContin were also

refilled.  (Tr. 685.)  On December 3, the Clinic adjusted plaintiff's medications for depression and chronic low back pain.  (Tr. 684.)

Plaintiff returned to Pike Medical Clinic on January 5, 2010, and reported having to use her nitroglycerin more often than in the past.  Plaintiff reported her pain to be okay and that she sometimes takes Vicodin four times a day.  Plaintiff's anxiety was noted to be controlled, and plaintiff's affect was noted to be appropriate.  Plaintiff's prescription for Hydrocodone was refilled for her lumbar disc disease.  Plaintiff's prescriptions for Xanax and Robaxin were also refilled.  (Tr. 682.)

Chest x-rays taken January 25, 2010, showed no acute process.  (Tr. 726.) ECG testing that same date yielded normal results.  (Tr. 724-25, 728.)

X-rays of the cervical spine taken on February 3, 2010, in response to plaintiff's complaints of pain and paresthesias in the left arm yielded no significant findings.  (Tr. 723.)

On February 4, 2010, plaintiff visited Dr. Arun Venkat for cardiology consultation.  Plaintiff reported having episodes of chest discomfort and mild shortness of breath.  Plaintiff also reported having occasional headaches, cough, joint pain, and leg pain.  Physical examination was unremarkable.  Dr. Venkat noted ECG results to be within normal limits.  Dr. Venkat ordered follow up stress and ECG testing and instructed plaintiff to continue with Plavix.  Zocor was

prescribed, and plaintiff was instructed to take aspirin daily.  (Tr. 736-37.)

ECG testing on February 10, 2010, showed mild mitral regurgitation and mild tricuspid regurgitation, but was other normal.  (Tr. 721.)

Between February 3 and March 3, 2010, plaintiff visited Pike Medical Clinic on four occasions for follow up and medication refills.  On March 3, plaintiff's current medications were noted to be Amlopidine, Methocarbamol, Omeprazole, Nitrostat, Bupropion, Metoprolol, OxyContin, Hydrocodone, Benzonatate, Zocor, Plavix, aspirin, and Alprazolam.  (Tr. 704-08.)

Plaintiff returned to Dr. Venkat on March 23, 2010, and reported having occasional arm numbness and occasional chest pain lasting about one minute. Plaintiff reported having no shortness of breath or syncope.  Physical examination was unremarkable.  Dr. Venkat diagnosed plaintiff with chest pain history, CAD, dyslipidemia, and hypertension.  Plaintiff was advised to stop smoking.  (Tr. 732.)

A stress test report dated April 8, 2010, showed significant EKG changes diagnostic of ischemia, but no stress-induced ischemia was noted.  Left ventricular function was normal.  (Tr. 861-62.)

Plaintiff returned to Dr. Venkat on April 22, 2010, and reported experiencing chest pain about three times a week when walking up a hill and occasional chest pain at rest.  Plaintiff also reported mild shortness of breath, palpitations, weakness, and joint pain.  Plaintiff also reported that she experiences

arm numbness when she lifts her hand, which Dr. Venkat opined could be related to degenerative joint disease. Dr. Venkat added Imdur to plaintiff's medication regimen for hypertension and instructed plaintiff to monitor her chest pain. (Tr. 855-56.)

Plaintiff visited Pike Medical Clinic on two occasions in April 2010 for follow up and medication refills. On April 30, plaintiff was advised not to overuse her pain medications. (Tr. 744-46.)

On May 17, 2010, Michael Stacy, Ph.D., a psychological consultant for disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's depression and anxiety were not severe impairments inasmuch as they caused no restrictions in plaintiff's activities of daily living; mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Tr. 748-58.)

On June 10, 2010, plaintiff complained to Dr. Venkat that she continued to have chest discomfort with activity, such as riding a bike about five blocks and walking. Plaintiff reported shortness of breath when going up stairs. Plaintiff reported exertional shortness of breath, dizziness, occasional palpitations, weakness, headache, and cough. Physical examination was unremarkable. Given plaintiff's symptoms and lack of significant results from diagnostic testing, Dr.

Venkat suggested that plaintiff undergo a coronary angiography. (Tr. 851.)

On June 24, 2010, plaintiff reported to Dr. Venkat that she had no chest pain or shortness of breath. (Tr. 840.)

On July 29, 2010, plaintiff reported to Dr. Venkat that she had occasional chest discomfort that improved with nitroglycerin. Plaintiff also reported occasional shortness of breath, edema, joint pain, and dizziness. Dr. Venkat noted a recent cardiac catheterization to show patent LAD stents. Plaintiff was diagnosed with stable angina, possibly related to small vessel disease. Compliance with medications was discussed. (Tr. 836.)

On October 29, 2010, plaintiff reported to Dr. Venkat that she had only rare chest pain and mild shortness of breath with exertion. Physical examination was unremarkable. Dr. Venkat stressed to plaintiff the importance of medication compliance. (Tr. 832.)

Plaintiff returned to Dr. Venkat on February 17, 2011, and reported having intermittent chest discomfort with occasional shortness of breath. Physical examination was unremarkable. Dr. Venkat diagnosed plaintiff with stable angina and instructed plaintiff to continue on her medications. (Tr. 822.)

Plaintiff was admitted to PCMH on May 25, 2011, with complaints of chest discomfort with radiation to the left arm. Plaintiff's past medical history was noted. Plaintiff's current medications were noted to be Zocor, Amlopidine,

Metoprolol, Bupropion, Plavix, nitroglycerin, aspirin, Norco, and OxyContin.

EKG testing showed normal sinus rhythm and non-specific T-wave abnormalities.

Plaintiff's chest pain resolved, and she was discharged on May 26 with a diagnosis

of atypical chest pain. Plaintiff was prescribed Cardizem and Isosorbide upon

discharge and was instructed to continue on her other medications. (Tr. 759-807.)

Myocardial perfusion tests performed on June 9, 2011, showed normal left

ventricular function and no stress-induced ischemia. ECG testing yielded normal

results. (Tr. 809-11.)

## IV. Additional Evidence Before the Appeals Council[4]

On August 18, 2011, plaintiff reported to Dr. Venkat that she experienced

mild dyspnea, cough, palpitations, and leg pain. Plaintiff reported having no chest

pain. Physical examination was unremarkable. Dr. Venkat noted the results of

recent diagnostic testing to be essentially normal. (Tr. 918.)

An MRI taken of the lumbar spine on November 5, 2011, in response to

plaintiff's complaints of left leg sciatica showed small focal central disk profusion

at L4-5 and slight annular disk bulging at L5-S1, asymmetric toward the right. (Tr.

915.)

---

[4] In making its determination to deny review of the ALJ's decision, the Appeals Council considered additional evidence which was not before the ALJ. The Court must consider this additional evidence in determining whether the ALJ's decision was supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

## V. The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through June 30, 2011. The ALJ found that plaintiff had not engaged in substantial gainful activity since March 1, 2009. The ALJ determined the evidence to show that plaintiff had status-post stent placement in the left anterior descending artery, degenerative disc disease of the lumbosacral spine and thoracic spine, hypertension and hyperlipidemia controlled by medication, status-post right fourth toe and left wrist fractures, and a history of mild depression and anxiety also controlled by medication. The ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 64.) The ALJ found plaintiff to have the RFC to perform work

> except probably for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; walking more than 2 hours out of an 8-hour day; climbing of ropes, ladders or scaffolds; doing more than occasional climbing of ramps and stairs or more than occasional balancing, stooping, kneeling, crouching, or crawling; or having concentrated or excessive exposure to unprotected heights or dangerous moving machinery or to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants.

(Tr. 65.) The ALJ found there to be no credible, medically-established mental limitations. The ALJ determined plaintiff not able to perform any of her past relevant work. Considering plaintiff's age, education, work experience, and RFC,

the ALJ determined vocational expert testimony to support a finding that plaintiff could perform light work as it exists in significant numbers in the national economy, such as retail marker, folding machine operator, and cafeteria attendant; as well as sedentary work, such as document preparer, circuit board assembler, and laminator. The ALJ thus found plaintiff not to be under a disability through the date of the decision. (Tr. 65-66.)

## VI. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a

reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence

which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

In this cause, plaintiff challenges the manner and method by which the ALJ determined her RFC, arguing that the ALJ provides no rationale to support his conclusions, that no medical evidence supports the RFC determination given the lack of medical RFC assessments in the record, and that substantial evidence fails to support a finding that plaintiff can perform sustained work activities. Plaintiff also claims that the ALJ erred in his analysis finding plaintiff's subjective complaints not to be credible. Contrary to plaintiff's assertions, a review of the ALJ's decision shows the ALJ to have thoroughly discussed and properly analyzed the substantial evidence of record supporting his credibility and RFC determinations. For the following reasons, plaintiff's claims otherwise fail.

A.    Credibility

Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations." *Cline*, 939 F.2d at 565; *see also Renstrom,* 680 F.3d at 1066; *Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001); *see also Casey v. Astrue*, 503 F.3d 687,

696 (8th Cir. 2007).  The determination of a claimant's credibility is for the

Commissioner, and not the Court, to make.  *Tellez,* 403 F.3d at 957; *Pearsall*, 274

F.3d at 1218.

Here, plaintiff claims that the ALJ merely invoked *Polaski* in his decision

and failed to apply the relevant factors in weighing the credibility of her subjective

complaints.  Plaintiff's claim is without merit.

In his written decision, the ALJ set out numerous inconsistencies in the

record to support his determination that plaintiff's subjective complaints were not

credible.  First, the ALJ noted that plaintiff's impairments pre-dated her alleged

onset of disability for a period of years and that plaintiff was able to work during

that time.  The ALJ noted the medical evidence to show plaintiff's conditions not

to have progressed subsequent to her onset date and, indeed, that plaintiff's

impairments were stable with only minor exacerbations that resulted in no

significant limitations or complications.  *See, e.g., Goff v. Barnhart*, 421 F.3d 785,

792-93 (8th Cir. 2005) (fact that claimant worked with impairments for over three

years, coupled with absence of evidence of significant deterioration, demonstrates

that impairments are not disabling in the present); *Brown v. Barnhart*, 390 F.3d

535, 540 (8th Cir. 2004) (impairment cannot be considered disabling if it can be

controlled by treatment or medication).  The ALJ also noted that no physician

implied that plaintiff was incapacitated or placed any restrictions on plaintiff that

exceeded those in the RFC.  *See, e.g., Forte v. Barnhart,* 377 F.3d 892, 896 (8th Cir. 2004); *Brown v. Chater,* 87 F.3d 963, 965 (8th Cir. 1996).  The ALJ further noted the treatment rendered for plaintiff's impairments, and specifically, that plaintiff's last inpatient hospitalization for her heart condition occurred in June 2007, that her last procedure for back pain occurred in June 2006, and that physical therapy for her wrist fracture ended in April 2009.  *E.g., Spradling v. Chater*, 126 F.3d 1072, 1075 (8th Cir. 1997) (lack of aggressive treatment inconsistent with complaints of disabling pain).  The ALJ also noted plaintiff's testimony that medication reduced her pain to a level two or three (Tr. 58) and that there was no documented record that plaintiff experienced any significant adverse side effects from medications (Tr. 62).  *Brown,* 390 F.3d at 540.  In addition, the ALJ noted the evidence to show that plaintiff did not exhibit signs consistent with chronic and severe musculoskeletal pain, such as muscle atrophy, muscle spasms, neurological deficits, and/or an inability to ambulate.  *See McClees v. Shalala*, 2 F.3d 301, 302-03 (8th Cir. 1993).  To the extent plaintiff reported that her daily activities were restricted because of her disabling impairments, the ALJ summarized plaintiff's description of her activities, which included grocery shopping, driving, performing light household chores, reading, watching television, and fishing and swimming with her children (Tr. 58), and found any claimed restrictions to be self-imposed rather than medically induced (Tr. 62).  *See, e.g., Spradling,* 126 F.3d at 1075

(engaging in hunting, fishing, cooking, cleaning, driving, and visiting friends inconsistent with complaints of disabling pain); *Onstead v. Sullivan*, 962 F.2d 803 (8th Cir. 1992) (engaging in light housework, cooking, watching television, reading, fishing, grocery shopping, and playing cards inconsistent with complaints of disabling pain).  The ALJ also noted plaintiff to testify that she got along well with other people and that there existed no documented evidence of frequent crying spells, memory loss, or panic attacks.  *See, e.g., Jones v. Astrue*, 619 F.3d 963, 975-76 (8th Cir. 2010) (no documented evidence supported claimant's claimed anxiety-induced limitations); *Cox v. Astrue*, 495 F.3d 614, 618-20 (8th Cir. 2007) (successful social relationships inconsistent with disabling mental impairment).  These reasons to discredit plaintiff's subjective complaints are supported by substantial evidence on the record as a whole.

To the extent plaintiff argues that Mr. Shealor's testimony supported her reports of limited activities, the ALJ found such testimony not to be credible inasmuch as, like plaintiff's, it was inconsistent with the other evidence of record. This finding was not error.  *See Perkins v. Astrue*, 648 F.3d 892, 901 (8th Cir. 2011).  The ALJ further determined not to credit Mr. Shealor's testimony inasmuch as Mr. Shealor had financial stake in the outcome of the case and was influenced by his affection for plaintiff and his natural tendency to believe and support her.  These findings were likewise not error.  *Id.*

A review of the ALJ's decision shows that, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility.  Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination.  *Goff*, 421 F.3d at 793; *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005); *Gulliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

B.    RFC Determination

A claimant's RFC is what she can do despite her limitations.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001).  The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  *Goff*, 421 F.3d at 793; *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a).  Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination.  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001).  Accordingly, the record must contain medical evidence sufficient to determine the claimant's RFC at the time of the

hearing. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). While the responsibility for determining RFC rests with the ALJ, the claimant nevertheless retains the burden to prove her RFC. *Eichelberger*, 390 F.3d at 591; *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003); *Pearsall*, 274 F.3d at 1217-18.

As discussed below, a review of the ALJ's decision and the relevant evidence of record shows the ALJ to have engaged in the proper analysis to determine plaintiff's RFC at the time of his decision. *See* SSR 96-8p, 1996 WL 374184 (Soc. Sec. Admin. July 2, 1996). Some medical evidence supports this determination and, for the following reasons, the determination is supported by substantial evidence on the record as a whole.

First, the ALJ thoroughly discussed the relevant medical evidence of record. With respect to plaintiff's heart impairment, the ALJ set out the history of plaintiff's heart attack and related stent placement in 1999, with subsequent bradycardia and related hospitalization in June 2007. The ALJ noted that while plaintiff had periodic complaints of chest pain thereafter, diagnostic testing consistently yielded essentially normal results and showed no progression of heart disease. Indeed, as noted by the ALJ, the medical evidence of record shows that during plaintiff's claimed period of disability, plaintiff's heart condition was mostly stable. With respect to plaintiff's musculoskeletal impairment, the ALJ noted diagnostic testing in 2006 to show mild kyphosis and moderate disc bulging

for which plaintiff underwent epidural injections. The ALJ noted that x-rays in February 2008 showed only mild disk disease and that a follow up MRI in March 2008 yielded results consistent with those from 2006. Finally, the ALJ noted that x-rays of the lumbosacral spine in July 2009 were negative and that the October 2009 MRI of the spine showed the disc bulging to be less prominent than in earlier studies. As discussed *supra*, the ALJ observed that all of these impairments existed prior to the alleged onset of disability, that is, March 1, 2009, and that plaintiff ably worked with such impairments. The ALJ also noted, and the record shows, that plaintiff's impairments did not progress or deteriorate on or after the alleged onset date. *See Goff*, 421 F.3d at 793 (RFC supported by substantial evidence where claimant effectively worked with impairment and there was no indication that condition deteriorated). Indeed, the record shows noted improvement and stabilization. To the extent the ALJ did not have before him the November 2011 MRI at the time of his decision, the results of the MRI demonstrate nothing greater in severity than prior images and thus would have done nothing to alter the ALJ's analysis of the medical evidence. The ALJ also noted evidence of plaintiff's acute illnesses and injuries – including isolated bouts of bronchitis and pneumonia, wrist fracture, and toe fracture – finding that none of these conditions resulted in long-term limitations or complications. Finally, the ALJ noted plaintiff's office visits in 2009 and 2010 to be primarily for medication

refills, including medication for depression. Although plaintiff contends that the ALJ failed to consider the significant medications she took for pain and her mental health, a review of the decision shows the ALJ to have considered the effects of such medications, and specifically, that plaintiff testified that her pain medications were effective (Tr. 58) and had no adverse side effects (Tr. 62), and that treatment notes showed plaintiff's mental impairment to be stable in January 2010 (Tr. 60). Regardless, the fact that plaintiff regularly took pain medication for her back pain is not in itself inconsistent with an RFC to perform work where the medical evidence showed plaintiff's condition to be mild. *See Steed v. Astrue*, 524 F.3d 872, 875-76 (8th Cir. 2008).

The ALJ also discussed the nonmedical evidence of record. The ALJ specifically noted plaintiff's educational and work history as well as her current living conditions. As discussed at length *supra,* the ALJ noted plaintiff's subjective complaints, Mr. Shearor's testimony as to plaintiff's activities, and the consistency of such complaints and observations with other evidence of record. The ALJ also noted plaintiff's own testimony regarding her exertional abilities, including lifting up to twenty-five pounds, sitting up to ninety minutes at one time, walking about two blocks at one time, and experiencing pain with bending or step-climbing.

Upon conclusion of his discussion of specific medical facts, nonmedical

evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed plaintiff's RFC based on the relevant, credible evidence and specifically set out plaintiff's exertional and non-exertional limitations and the effect of such limitations on plaintiff's ability to perform specific work-related activities. Indeed, the ALJ included specific limitations consistent with plaintiff's claimed ability to lift and walk as well as with her claimed postural limitations, including those relating to kneeling and climbing stairs. *Cf. Baldwin,* 349 F.3d at 557 (exertional restrictions in RFC consistent with claimant's testimony as to such). Plaintiff presents no evidence or argument demonstrating that she was more restricted than as determined by the ALJ. An ALJ is not required to disprove every possible impairment. *McCoy v. Astrue,* 648 F.3d 605, 612 (8th Cir. 2011).

Although plaintiff argues that the record lacked *opinion* evidence upon which the ALJ could make an RFC determination, the mere lack of opinion evidence in itself is not a sufficient basis upon which to find an ALJ's decision not supported by substantial evidence where, as here, the ALJ thoroughly and properly considered all of the available medical and testimonial evidence of record in determining plaintiff's RFC. *Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004).

The ALJ properly established plaintiff's RFC based upon all the record

evidence in this cause, including medical and testimonial evidence.  Because the record contains some medical evidence that supports the RFC and substantial evidence on the record as a whole supports the determination, the ALJ did not err. *Baldwin*, 349 F.3d at 558; *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam).

## VI.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled through the date of his decision is supported by substantial evidence on the record as a whole, and plaintiff's claims of error are denied.

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 18th day of February, 2014.


   /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE